### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### PADUCAH DIVISION

UNITED STATES OF AMERICA

    v.                                         No. 5:23-cr-38-BJB

NATASHA HARRIS-JOHNSON

* * * * *

### OPINION & ORDER DENYING SUBPOENA ISSUANCE AND STAY

In the middle of her ongoing federal fraud trial, *pro se* Defendant Natasha Harris-Johnson indicated, for the first time, her desire to subpoena nine witnesses. All nine appear to be Kentucky government officials, including the Attorney General, Treasurer, Assistant Secretary of State, and Commissioner of the Department of Revenue. The record supporting this request is thin—a list of nine names, an in-court discussion of why Harris-Johnson seeks to question these witnesses, and a set of approximately 30 documents Harris-Johnson shared with the Court. These documents include photographs of what appears to be correspondence between Harris-Johnson and the SEC and FINRA, social-media posts, screen-grabs from a Bloomberg Terminal, IRS and Kentucky Secretary of State documents, a copy of an Alabama Circuit Court case regarding foreclosures and constructive trusts, websites discussing statues and legal concepts, and an excerpt from a document that appears to describe so-called Sovereign Citizen ideas. The nature of other documents, and the origin and authenticity of any documents, are not clear. Particularly given the forgiving approach that judges afford *pro se* criminal defendants, the Court construes Harris-Johnson's submission as a request to issue subpoenas to these witnesses, as well as a request to stay the trial so she could further support that request or effect service of any issued subpoenas.

Mindful of Harris-Johnson's important right to present a defense and after careful consideration of her arguments, the Court declines to delay trial to issue subpoenas seeking testimony that is highly unlikely to prove admissible or material to the trial.

Federal Rule of Criminal Procedure 17(b) provides that "[u]pon a defendant's ex parte application, the court must order that a subpoena be issued for a named witness if the defendant shows … the necessity of the witness's presence for an adequate defense." In determining whether a witness is "necess[ar]y" to "an adequate defense," the Sixth Circuit has recognized that trial judges are "vested with wide

1

discretion." *United States v. Moore*, 917 F.2d 215, 230 (6th Cir. 1990). Although the right to subpoena witnesses under Rule 17(b) is grounded in "the Sixth Amendment right to compulsory process," *id.*, that right is not unlimited and untimed. "Neither rich nor poor defendants have an unfettered right to subpoenas without discretionary review by the district court." *Id.* at 231.

In deciding whether a witness is necessary, district judges examine whether "the accused avers facts which, if true, would be relevant to any issue in the case." *Id.* (citation omitted); *see also id.* at 230 ("[T]he word 'necessary' must be read to mean relevant, material and useful to an adequate defense.") (quoting prior version of Rule 17(b)). If so, "the requests for subpoenas must be granted, unless the averments are inherently incredible on their face." *Id.* at 230–31. In particular, the Court of Appeals has acknowledged that the discretion to deny subpoena requests (and the corresponding delays in serving subpoenas and arranging trial testimony) "is necessary to prevent abuses" that could be "attempted by defendants." *Id.* at 230. Mere "[g]eneralities," moreover, "are insufficient to make out a satisfactory showing that the witnesses are needed." *United States v. Barker*, 553 F.2d 1013, 1020–21 (6th Cir. 1977) (quotation marks omitted).

The list of witnesses that Harris-Johnson submitted does not make clear what topics she expects these state officials to address or how their testimony might bear on her criminal case. This prosecution involves eight counts of false claims to federal tax authorities and one count of wire fraud involving the federal Small Business Administration. Outside the presence of the jury, therefore, the Court asked Harris-Johnson to explain what testimony she sought and how it might relate to her defense.

Based on the Court's best understanding of Harris-Johnson's response, she has three theories for why this testimony might be relevant.

The first relates to record-keeping. She believes, based in part on an apparent conversation with an employee of the federal Securities and Exchange Commission, that the Commonwealth possesses records reflecting income that Harris-Johnson claims she earned in Kentucky. The records Harris-Johnson tendered reflecting SEC correspondence, however, don't identify any particular state records that might reflect such income. Nor has Harris-Johnson described what those records might be or why any of these nine officials might be a custodian or otherwise able to testify to her income or any records reflecting it. And Harris-Johnson, to her credit, has already filed open-records requests with the Commonwealth seeking these documents—thus far to no avail. Given the lack of any responsive documents and the failure to identify specific records or information these witnesses are likely to have, their testimony doesn't appear relevant under the Rules of Evidence, much less necessary to an adequate defense.

2

The second reason relates to Harris-Johnson's assertion that the Commonwealth somehow forced her into a "guardianship" or "partnership" against her will. This theory is more nebulous, even for Harris-Johnson, who believes that SEC conversations and perhaps records indicate some sort of *parens patriae* relationship (with the Commonwealth serving as a "nominee") relative to her interests in mortgage-related property or income streams. Despite her best efforts to identify materials explaining this issue through open-records responses and study of the documents available to her, Harris-Johnson unfortunately seems unable to articulate any such relationship in a manner likely to lead to additional discoverable or admissible information. Whether any of the nine state officials might have any knowledge of such a relationship is therefore speculative making the subpoenas, again, improper at this stage and unnecessary to an adequate defense.

The third argument in support of the subpoena request lands nearer to a factual issue that might conceivably arise at trial. It attempts to connect the income and withholding reported on the Government tax documents (already admitted into evidence) to property or income interests that Harris-Johnson claims in mortgage-backed securities (not yet introduced or even previewed to the jury). Based on the Court's lengthy discussion with Harris-Johnson and review of the documents she presented to the Court, none of the nine state witnesses would appear to have any connection to this factual theory.

To briefly and tentatively summarize, this third theory resembles the following:

Harris-Johnson previously bought and mortgaged a house in Paducah. The bank foreclosed on that house for reasons she believes were improper and illegal. She later learned that her mortgage had been "securitized"—that is (roughly speaking), the bank sold it, along with many others, to a trust according to a Pooling & Service Agreement (PSA), and then another financial institution sold tradeable interests (securities) in that pool of loans to investors. Harris-Johnson identified the mortgage-backed security tied to her home, saw that it remained valuable and profitable, and surmised that an illegal foreclosure gave her some valid claim on the proceeds of the trust. In support of this theory, she appears to rely on an unreported Alabama trial-court decision, *Horace v. LaSalle Bank Nat'l Ass'n*, which treated a mortgagor as a third-party beneficiary of a PSA based on alleged trust violations following securitization. She appears to have considered herself similarly situated and similarly entitled. But instead of going to court and seeking a constructive-trust designation, she used a Bloomberg Terminal to identify "her" mortgage-backed security and its proceeds, a portion of which she claimed as her own income (subject to IRS withholding). One document supplied by Harris-Johnson appears loosely related: an excerpt that bears hallmarks of Sovereign Citizen beliefs declares that state "birth records function much like an Initial Public Offering ..., creating

3

instruments tied to each individual's date of birth that establishes 'uses, users, and sources of revenue' in perpetuity across agencies and markets," and that "by reappearing and asserting control over anatomical gifts, wills, and derivative instruments," "[w]e, the people … reclaim immunity and beneficial ownership." Beyond that, this account rests entirely on Harris-Johnson's own (unsworn) explanation to the Court.

This summary is necessarily incomplete and somewhat speculative, given that no evidence has been offered in support of beyond the disparate documents mentioned above. But it represents the Court's best attempt to understand her position, and to view her submissions in the light most favorable to her defense, at this stage in the proceedings. Whether this theory or any proof bears on her actual income and withholding, or merely her mental state in submitting IRS documents, is likewise not yet clear. Without passing on the merits of these arguments, the Court merely notes their attenuation from any of the nine state witnesses she has identified.

In short, the Court finds that none of Harris-Johnson's explanations shows that the testimony of any of the witnesses Harris-Johnson wants would be of "necessity" to her case. Whether the Commissioner of the Kentucky Department of Revenue might have information about the Commonwealth's financial situation or a "nominee" relationship to her finances, for instance, has little if anything to do with whether she submitted a false claim or attempted wire fraud against the federal government.

Even were the Court inclined to issue the requested subpoenas, moreover, it would not warrant pausing the trial at this point. Harris-Johnson hasn't offered any reason why these potential witnesses couldn't have been subpoenaed sooner, nor any explanation for how and when she might serve subpoenas on these (presumably busy) state officials in order to obtain their appearance in Paducah, nor how this could happen without unreasonably disrupting and delaying the ongoing trial. Notably, this appears to be the first time Harris-Johnson has asked this Court to issue trial subpoenas—despite several evidentiary and pretrial hearings held in advance of this trial (which was rescheduled from November at her request). But this is *not* the first time she has requested a stay during or on the eve of trial—motions based on jurisdictional arguments, allegations of bias, an interlocutory appeal, a reconsideration request, and the need for more trial preparation. The Court has thus far largely denied these motions, and declines to change course here. To the extent Harris-Johnson's unfamiliarity with the trial and discovery rules helps explain this lack of diligence and promptness, that is to a large extent a function of her decision to represent herself and decline the assistance of experienced, Court-appointed defense counsel who might've requested subpoenas sooner (assuming they could overcome the Rule 17 hurdles described above).

This history defeats any request for further delay. Trial judges asked to stay proceedings for subpoena service weigh "the diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is able to describe their expected knowledge or testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony." *Bennett v. Scroggy*, 793 F.2d 772, 774 (6th Cir. 1986) (quoting *Hicks v. Wainwright*, 633 F.2d 1146, 1149 (5th Cir. 1981)). In weighing those factors within their "discretion," moreover, trial judges require "the moving party [to] show that the witness would have given substantial favorable evidence." *United States v. Sawyers*, 902 F.2d 1217, 1219 (6th Cir. 1990). As described above and on the record during this trial, this request fails on each element—diligence, probability, specificity, favorability, and uniqueness. So no further delay is warranted here.

### ORDER

The Court construes Harris-Johnson's subpoena list as a request that the Court issue nine subpoenas to state-government officials or, in the alternative, a request to stay the trial so she can pursue subpoenas and their service. The Court denies both requests.

Benjamin Beaton, District Judge

United States District Court

January 15, 2026