# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### PADUCAH DIVISION

UNITED STATES OF AMERICA

    v.                                  **No. 5:23-cr-38-BJB**

NATASHA HARRIS-JOHNSON

**\* \* \* \* \***

## ORDER

Natasha Harris-Johnson, acting *pro se*, has moved—among other things—to dismiss the indictment, vacate the jury's verdict, disqualify the jury venire, compel additional discovery from the Government, and stay proceedings pending an appeal. These requests follow her convictions on eight counts of false claims and one count of wire fraud.  Her trial lasted five days and itself followed more than twenty pretrial motions, three efforts to disqualify the jury venire, an interlocutory appeal, a petition for a writ of mandamus, a petition for a writ of prohibition, testimony from the Deputy Clerk, and extensive *voir dire* of the Defendant by the trial judge.

These post-trial motions, like practically all of those raised before and during trial, all fail.  So this case must, at long last, proceed to sentencing.  After the Court issues its sentence and final judgment, Harris-Johnson may of course raise her disagreements with the appellate court.

## I.    Renewed Arguments

Many of Harris-Johnson's post-trial arguments repeat positions asserted and rejected previously.  Now, as before, Harris-Johnson contests the Court's jurisdiction, complains that she was not allowed to observe grand-jury proceedings, insists that the indictment charged a corporation rather than a "living woman," demands that the Court sanction the prosecutor for failing to follow Criminal Rule 12.4, and protests that even if she tried to steal $6 million dollars from the U.S. Government, she's immune to criminal liability for it.  *See, e.g.*, DN 164, DN 175, DN 176, DN 177, DN 178.

Her reasons for these arguments vary along a relatively consistent Sovereign Citizens theme.  She withheld "[c]onsent" to "jurisdiction," DN 175 at 4; "reserve[d] all rights without prejudice" under the Uniform Commercial Code, *id.* at 3; filed a "Declaration of Ecclesiastical Title," DN 158 at 1; cancelled any financial obligations she might owe to the Government by filling out copies of IRS Form 1099-C, *see* DN

1

164 at 2, 3; and remains a "Self-Sovereign American Civilian," DN 176 at 3. *See also* DN 100 at 1 (describing Harris-Johnson's pretrial argumentation); DNs 111 & 113 (Court of Appeals orders denying interlocutory relief); DNs 50 at 2 n.†, 71 at 1, 73 at 1–2, 75 at 1, 76 at 1–2, 87 at 3–5, and 94 at 1 (rejecting Harris-Johnson's theories as frivolous).

The Court will not reconsider arguments in this vein. When the Court ordered the Clerk to produce documents pertaining to Harris-Johnson's venire challenge, it also warned that "this should not be misunderstood as an opportunity to revisit the jurisdictional, grand-jury, due-process, and other threshold objections repeatedly advanced and rejected pretrial." Initial Venire-Challenge Order at 4. "After entertaining numerous briefs and oral arguments on these issues," the Court explained, it was "satisfied of its jurisdiction and convinced that none of Harris-Johnson's arguments about alleged financial relationships, identity, or prosecutorial misfeasance warrants delay." *Id.* Now as then, the Court's "decisions on these threshold arguments are … the law of the case." *Id.* They "cannot be argued and reargued without end," and the Court will not reconsider them. *Edmonds v. Smith*, 922 F.3d 737, 739–40 (6th Cir. 2019).

For this reason, the Court rejects Harris-Johnson's renewed argumentation about her identity, trust law, the Uniform Commercial Code, the supposed "securitization" of birth certificates, the theory that the Commonwealth of Kentucky is somehow responsible for prosecuting this federal case, suggestions that the Defendant has avoided criminal liability by withholding "consent" to status as a "taxpayer" or "U.S. person," and other positions that the Court has repeatedly rejected as frivolous. *See, e.g.*, DNs 175 & 176 (Harris-Johnson's arguments); DN 100 (Court's order citing previous engagement with these issues).[1]

## II.    Harris-Johnson's Motions to Strike the Venire Panel

Harris-Johnson also has pressed a more conventional argument that she first raised after *voir dire* on the first day of trial: that the venire panel from which her petit jury was drawn included too few African Americans. All in, she made five motions on this front: one orally, during jury selection; two written, during trial; and two more written, after trial and after the Clerk docketed all the relevant records. The Court denied her oral motion from the bench. *See* Initial Venire-Challenge Order at 3. Then she filed one set of written motions during trial, before the Clerk testified and docketed all the relevant records (DNs 123 & 124). After the Clerk testified and filed additional records, *see* DN 144, Harris-Johnson expanded upon her

---

[1] In this category, Harris-Johnson has also sent the Court a "Kentucky UCC Statement Request Form" (DN 190). According to that invoice, the Court owes the "Natasha Harris-Johnson Trust" $98. *Id.* For what, she does not say.

argumentation in a second set of written motions (DNs 149 & 150). These written motions fail, too, as explained further below.

The Sixth Amendment, as interpreted by the Supreme Court, gives criminal defendants a right to a jury "drawn from a fair cross-section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). A defendant may therefore challenge a petit or grand jury by objecting that the pool from which it was drawn "excluded … a 'distinctive' group in the community" by some flaw "inherent in the particular jury-selection process utilized." *Duren v. Missouri*, 439 U.S. 357, 364, 366 (1979).

"To establish a prima facie case for a fair-cross-section claim, a defendant must show: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *United States v. Johnson*, 95 F.4th 404, 410–11 (6th Cir. 2024) (quoting *Duren*, 439 U.S. at 364). In simpler terms, a defendant must identify a "disparity" suggesting "systematic exclusion" and link it to "a specific procedural or operational flaw." *Id.* at 412 (citation omitted).

Harris-Johnson's first midtrial motion to disqualify the venire (presented orally) failed to "establish a prima facie case for a fair cross-section claim." Initial Venire-Challenge Order (DN 121) at 1–2. Harris-Johnson "alleged but [had] not yet shown that the venire representation is not fair and reasonably relative to the community." *Id.* at 2. The Court therefore recognized "Harris-Johnson's right to challenge the venire" and ordered the Clerk to docket recent AO-12 forms[2] for the Paducah Jury Division. *Id.* at 3. Then the Court gave Harris-Johnson a chance to

---

[2] An AO-12 form is created by the Administrative Office of the Courts and regularly completed by the Clerks of U.S. District Courts. The form:

> provides the following information on the current, non-emptied master jury wheel used by the Division: (1) general information about the master wheel, including identification of the source data and number of names placed in the wheel; (2) data related [to] the sampling of returned questionnaires, including [the] number of forms mailed, returned, returned undeliverable and demographic data concerning the race, ethnicity, and sex of those individuals returning forms; (3) data related to the sampling of the qualified jury wheel including relevant demographic data of the qualified wheel; and (4) a comparison of the jury wheel sample against the population of the jury division.

*Johnson*, 95 F.4th at 414 n.3; *see also* Nina W. Chernoff & Joseph Kadane, *Preempting Jury Challenges: Strategies for Courts and Jury System Administrators*, 33 JUSTICE SYSTEM JOURNAL 47, 59 (2012).

"identify any significant statistical disparity she may perceive and then argue why it is or may be traceable to the Court's procedures." *Id.*

Citing both the Sixth Amendment and the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.*,[3] Harris-Johnson again asks the Court to disqualify the venire based on statistics. African-Americans, she argues, compose 8.69% of the eligible population in the Paducah Division, but only 4.05% of the "[q]ualified jury wheel." DN 124 at 2. "This disparity," Harris-Johnson insists, "exceeds thresholds repeatedly found unconstitutional." *Id.* (citing *United States v. Weaver*, 267 F.3d 231 (3d Cir. 2001)).

The fair cross-section requirement, however, "focuses only on the 'procedure for selecting juries, and not the outcome of that process.'" *Johnson*, 95 F.4th at 410 (quoting *Ambrose v. Booker*, 684 F.3d 638, 645 (6th Cir. 2012)). No defendant is "entitled to" a jury pool or seated jury "of any particular composition." *Taylor*, 419 U.S. at 538. Neither the Sixth Amendment nor the statute "require[s] that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Id.* *See also United States v. Watkins*, 691 F.3d 841, 851 (6th Cir. 2012) (applying *Taylor* both to the venire composition and the resulting petit jury). The fair-cross section requirement instead concerns flawed processes. It doesn't entitle a defendant to spin the wheel a second time just because a benign process produced a statistical anomaly in her jury draw.

For this reason, the decisions that *do* find systematic exclusion feature obvious procedural flaws. *See, e.g.*, *Garcia-Dorantes v. Warren*, 801 F.3d 584, 590–91 (6th Cir. 2015) (inadvertent computer glitch underrepresented black citizens); *Smith v. Berghuis*, 543 F.3d 326, 340–41 (6th Cir. 2008) (county procedures allowing generous opt-outs and reassignment of black jurors to district court caused underrepresentation in circuit courts), *rev'd on other grounds*, 559 U.S. 314 (2010). Accordingly, the courts of appeals have required challengers to identify some external factor tainting the selection process, not just the statistical output of that process. *See, e.g.*, *Ford v. Seabold*, 841 F.2d 677, 685 (6th Cir. 1988) ("selection of jurors from a neutral master list, without more," can't "be construed as 'systematic exclusion'"). Nor can the reason offered be one (like, say, a group's relatively less-frequent voter registration or responses to jury summonses) that could affect the pool of prospective jurors without revealing judicial exclusion along suspect lines. *See United States v. Smith*, 108 F.4th 872, 878 (D.C. Cir. 2024) (statistical disparity due to group's failure

---

[3] The Act sets "the same" substantive standards as the Sixth Amendment, but supplies additional procedure. *Johnson*, 95 F.4th at 411. *See also* Initial Venire-Challenge Order at 2 n.3 (reciting procedural distinctions).

to respond to summons not a "systematic exclusion"); *United States v. Cecil*, 836 F.2d 1431, 1448 (4th Cir. 1988) (same for failure to register to vote).

Yet, as the Deputy Clerk testified in response to Harris-Johnson's midtrial motion, the Western District uses an entirely race-neutral process. The District's Plan for the Qualification and Random Selection of Grand and Petit Jurors closely tracks the Jury Selection and Service Act. Indeed, it was created to track those statutory requirements and confirmed by the Sixth Circuit's Judicial Council to comply with the statute. The Plan begins with Kentucky agencies' lists of registered voters, licensed drivers, and adults with State-issued ID cards. General Order 25-04 § 2.03. Names "selected at random" from these lists fill the master wheel every four years, as § 1863(b)(3) & (4) require. *See* General Order 25-04 §§ 2.03, 2.05, 2.06. The Deputy Clerk draws names from the wheel to form quarterly jury pools; anyone drawn must complete a juror-qualification questionnaire. General Order 25-04 §§ 2.08 & 2.09; 28 U.S.C. § 1864(a); *see* Trial Tr. Vol. 5 at 7:12–8:3, 9:3–9:5. And then the Deputy Clerk randomly draws a petit pool for each day on which a petit jury will be impaneled. § 1866(b); General Order 25-04 § 2.08; *see* Trial Tr. Vol. 5 at 10:16–10:24 (explaining that for each pool, a "computerized system" draws prospective jurors). The Deputy Clerk explained this process during trial and testified, under oath, that she "kn[e]w of no deviations from this particular plan" in Harris-Johnson's case. Trial Tr. Vol. 5 at 11:22–25. And she inferred that any racial disparity owes to "the randomization of the process" rather than deliberate design or malfunction. *Id.* at 14:9–10.

In the face of this evidence that the process is consistent, mechanical, and race-blind, Harris-Johnson can't disqualify the venire by showing merely that the designed randomness of the process produced a disparity in her case. She must point to a step in the process that excludes African Americans despite its designers' efforts. *See Johnson*, 95 F.4th at 410 (explaining that the selection plans envisioned by the statute implement a Sixth Amendment "guarantee" of "random[ness]").

A. <u>Process objections</u>

Perhaps in response to this precedent, Harris-Johnson insists that her "jury challenge is based on process-level, persistent underrepresentation, not a single venire outcome." Affidavit in Support of Jury Selection Challenge (DN 148) at 1. And she raises what she sees as four procedural errors in the process the Deputy Clerk described. First, the master wheel is filled based on "voter and driver lists." DN 124 at 3. Second, the process doesn't "correct 'Unknown' racial classifications." *Id.* Third, the Clerk never used his authority under General Orders 25-04 and 25-17 "to supplement pools where necessary … despite documented demographic depletion." DN 150 at 2. Last, "[t]he [2021] Master Wheel was not timely replaced." *Id.* at 3.

The first two objections find no support in precedent.

5

Reliance on "voter registration lists," even "as the exclusive source of jury venire members," "does not generally constitute systematic exclusion" of African Americans. *Johnson*, 95 F.4th at 415. And like the Defendant in *Johnson*, Harris-Johnson "points to nothing to suggest systematic underrepresentation in the voter registration lists or an operational flaw in [the Western District's] use of these lists that may have caused an underrepresentation of African Americans." *Id.* The same goes for lists of licensed drivers. Like voter lists, lists of licensed drivers reflect broad swaths of the population and carry the imprimatur of the Commonwealth. And as with voter lists, the Court has no reason—at least on this record—to suspect that driver lists impermissibly underrepresent African Americans. "[S]peculation that an issue might contribute to the underrepresentation of African-Americans," after all, "is not enough to establish a prima facie Sixth Amendment violation," particularly when underrepresentation on a given list is "the result of individual choice." *Bates v. United States*, 473 F. App'x 446, 451 (6th Cir. 2012). *See also United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006) ("Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*"); *United States v. Sanchez*, 156 F.3d 875, 879 (8th Cir. 1998) (rejecting voter-registration challenge "[a]bsent proof that certain racial or ethnic groups face obstacles in the voter registration process"). If anything, the choice to "supplemen[t]" "voter[-]registration lists … with drivers' license lists" should *improve* racial representation by sweeping in people whom voter lists would exclude. *United States v. Greene*, 971 F. Supp. 1117, 1121 (E.D. Mich. 1997) ("Drivers lists tend to be more reliable because licenses are" subject to frequent renewal and "often required in order to cash a check or use a credit card").

As for Harris-Johnson's second objection (which comes without citations), the Court is aware of no authority for the proposition that court staff must somehow force prospective jurors to racially self-identify if they haven't done so on the form. Much less any authority that clerks must alter or replace "Unknown" racial designations with their own guesswork. Even if the Clerk of Court labored under such a fraught obligation, moreover, it wouldn't go to the fairness of the process—just the records documenting it. A prospective juror's decision not to state his race on a form doesn't prevent him from contributing to the cross-section the Sixth Amendment requires. Harris-Johnson might prefer the "transparent verification of representativeness" that mandatory racial self-identification could perhaps afford. Affidavit (DN 148) at 1. But the statute does not require—and the Constitution may well forbid—excluding her fellow citizens from jury service just because they decline to volunteer that information. *Cf. Batson v. Kentucky*, 476 U.S. 79, 87 (1986) ("by denying a person participation in jury service on account of his race, [a] State unconstitutionally discriminate[s] against the excluded juror").

Harris-Johnson's third and fourth procedural objections are equally unfounded.

The third rests on a misunderstanding of this Court's General Order 25-07, which extended the time to empty the 2021 master wheel. To Harris-Johnson's mind, this extension "shows the Master Jury Wheel refill was delayed, meaning Defendant's petit jury was drawn from an outdated, statutorily noncompliant wheel." DN 150 at 2.

This objection is factually mistaken, however. Her petit pool was drawn not from the 2021 master wheel that Harris-Johnson sees as "outdated," but from its 2025 replacement. *See* 12/03/2025 AO-12 (DN 122-2) at 1. And nothing would appear to be remiss even if the Clerk used the 2021 version. That's because the statute allows courts to "provide for periodic emptying and refilling of the master jury wheel at specified times," subject only to a four-year time limit. 28 U.S.C. § 1863(b)(4); *see* Trial Tr. Vol. 5 at 6:11–14 (testimony of Deputy Clerk). The Plan sets these four-year intervals by directing the Clerk "to empty and refill the divisional master wheels between January 1 and May 1 in years subsequent to presidential elections." General Order 25-04 § 2.06. But emptying and refilling takes time. Which is why, rather than set a deadline during which the emptying-and-refilling process must be completed, the statute provides only that "the interval" between periods of "emptying and refilling … shall not exceed four years." § 1863(b)(4). This Court's General Order 25-07, which gave the Clerk three extra months "to complete the emptying and refilling," satisfies that requirement.

Harris-Johnson's fourth and final objection is that the Clerk should've scrutinized the wheel over time to detect and correct any racial disparity that emerged. But this misconceives the Clerk's authority and obligations. To start, nothing in the Plan empowers the Deputy Clerk to spontaneously refill the master wheel—no matter the reason. She may do so only as "ordered by the Court." General Order 25-04 § 2.06; *see* § 2.07 (if "necessary to place additional names into one or more of the master jury wheels …, the Chief Judge will direct the Clerk to obtain additional names from the source lists"). True, General Order 25-17 authorizes the Clerk to "supplement the pools of *petit jurors* serving [enumerated] terms" (emphasis added) by drawing additional names from the master wheel. Harris-Johnson is wrong, however, to suppose that this order confers some freewheeling discretion to spot and fix "demographic deficiencies." DN 150 at 2. It allows the Clerk to draw more names only "when doing so is necessary to meet the needs of the Court." General Order 25-17 at 1. And even if the Clerk had such a power, Harris-Johnson identifies no authority for the proposition that court staff have a duty (constitutional or otherwise)

to keep an eye out for "racial depletion" over time in a master wheel selected through a permissible process and "correct" it by drawing more names.  DN 150 at 1–2.[4]

Nor does Harris-Johnson offer any reason to believe that the plan operated incorrectly here.  Harris-Johnson doesn't allege, for instance, that some "glitch" caused the system to malfunction, *see, e.g.*, *Garcia-Dorantes*, 801 F.3d at 590–91, or that human error produced the disparity of which she complains.  And the Deputy Clerk testified that in summoning Harris-Johnson's petit pool, court staff followed the plan and the plan worked correctly.  Trial Tr. Vol. 5 at 11:18–11:25.  Any deviations from population-wide demographic figures, according to this undisputed testimony, are artifacts of "the randomization of the process."  *Id.* at 14:10; *see id.* at 10:11–10:14 (no "staff have any discretion in whom to call" because the process is "completely randomized").  Harris-Johnson's particular draw does not cast constitutional doubt on that process.

B.  <u>Statistical objection</u>

This leaves Harris-Johnson reliant on statistical disparities that she can't trace to procedural faults.  Her theory on this score seems to be that even if mere disparity doesn't transgress constitutional or statutory rules, a large and unexplained disparity can serve as *evidence* of some hidden infirmity.  *Cf. Johnson*, 95 F.4th at 412.  "[N]onextreme statistical disparities, standing alone," however, "are ordinarily insufficient to satisfy this requirement" and demonstrate systematic exclusion.  *Id.* at 413 (citing *Bates*, 473 F. App'x at 450).  "[A]n extreme underrepresentation *may* be enough to establish a *per se* systematic exclusion," *Bates*, 473 F. App'x at 450 (emphasis added), but the Sixth Circuit has never held as much, *see United States v. Jackson*, 768 F. App'x 400, 405 (6th Cir. 2019).  Meanwhile, the Sixth Circuit *has* explained that if this road is open at all, a challenger could walk it only by showing not just one large disparity but "a *routinely* 'large disparity.'"  *Johnson*, 95 F.4th at 413 (emphasis added) (quoting *Duren*, 439 U.S. at 366).

African Americans, Harris-Johnson points out, accounted for 4.05% of her petit pool and 8.69% of the jury-eligible population in the Paducah Division.  DN 124 at 2; DN 148 at 1.

Because the Supreme Court has not yet specified "the method or methods by which underrepresentation is appropriately measured," *Berghuis*, 559 U.S. at 329–30, lower courts have considered two statistical models: "absolute disparity" and "comparative disparity."  "Absolute disparity is the difference between a distinctive group's percentage in the general population and that group's percentage in the

---

[4] "Racial depletion" would appear impossible in Harris-Johnson's case in any event.  Her jury was drawn from the first petit pool drawn from the Paducah Division's 2025 master wheel.

8

qualified jury wheel." *Johnson*, 95 F.4th at 413. Based on the AO-12 information available here, that disparity in Harris-Johnson's petit pool just surpassed 4.2%. 12/03/2025 AO-12 at 1.[5] As to comparative disparity, "one must divide the absolute disparity of the distinctive group 'by that group's percentage in the general population.'" *Johnson*, 95 F.4th at 413 (quoting *Garcia-Dorantes*, 801 F.3d at 601). "[C]omparative disparity is a 'more appropriate measure of underrepresentation' when the overall population of a distinctive group is small, [but] it can still lead to misleading results where … the distinctive group is also only a small percentage of the community's jury-eligible population." *Id.* (quoting *Garcia-Dorantes*, 801 F.3d at 600–01). It "measures the decreased likelihood that members of an underrepresented group will be called for jury service, in contrast to what their presence in the community suggests it should be." *Id.* (quoting *Garcia-Dorantes*, 801 F.3d at 601). Here, because the raw numbers of African-Americans in the Paducah Division and Paducah Division jury wheels are small, the comparative disparity is much higher than the absolute disparity: about 53%.

The absolute disparity Harris-Johnson identifies falls short of what most courts around the country have required. Courts are generally reluctant to find a systematic exclusion of a racial group from the jury pool if "absolute disparities are less than 10%." *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 268 (3d Cir. 2019) (quoting *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998)). The absolute disparity here is less than half of 10%—though so, too, is the total percentage of African-American prospective jurors. And many courts of appeals have rejected absolute-disparity challenges with figures greater than the figure here. *See, e.g., id.* (5.83% insufficient); *Thomas v. Borg*, 159 F.3d 1147, 1151 (9th Cir. 1998) (5% absolute disparity insufficient even though no blacks were on jury panel); *United States v. Gault*, 141 F.3d 1399, 1402-03 (10th Cir. 1998) (5.74%, and 7.0% absolute disparities insufficient). *See also United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994) (3.4% absolute disparity insufficient); *Ramseur v. Beyer,* 983 F.2d 1215, 1232 (3d Cir. 1992) (absolute disparity of 14.1% "borderline"); *United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir. 1982) (4.7% and 7.7.% absolute disparities insufficient). Under this precedent, Harris-Johnson's statistical disparity doesn't by itself indicate that the Court's jury-selection procedures have (presumably unwittingly) excluded black citizens from the process on a systematic basis. *See Johnson*, 95 F.4th at 412–13.

Nor does a comparative disparity of 53% suffice, by itself, to demonstrate a violation. Some courts have demanded a wider gap than Harris-Johnson perceives, while others have seen problems with narrower ones. *See Howell*, 939 F.3d at 268

---

[5] Harris-Johnson asserts that African Americans composed 4.05% of the population; the AO-12, after removing "Unknowns" from the sample, lists the figure as 4.40%. DN 122-2 at 2.

(54.49% insufficient); *United States v. Chanthadara*, 230 F.3d 1237, 1257 (10th Cir. 2000) (40.89% insufficient where the distinctive group represented 7.9% of the population); *United States v. Clifford*, 640 F.2d 150, 155–56 (8th Cir. 1981) (46% insufficient where the group represented 15.6% of the population).

In this case, however, "comparative disparity" is less probative than it might be in other situations.

For one, Harris-Johnson's petit pool was an outlier. Seven African Americans made up a small proportion of the pool: 3.5%, measured against a black population of about 8.69% within the division. Source List Race/Gender Report (DN 144) at 5. All other recent pools reflected in the record, however, tended toward the mean: 4.5%, 5.39%, 6.97%, and 7.25% African American. *See id.* at 1–4. That makes Harris-Johnson's pool at most a one-off—not the "routinely large disparity" Sixth Circuit precedent requires. *Johnson*, 95 F.4th at 413 (quotation marks omitted).

And more generally, when a "distinctive group" is limited in size or "miniscule," as a statistical matter "even a small change in the group's share of the qualified jury pool would distort the comparative analysis." *Id.* at 414. *See also Weaver*, 267 F.3d at 243 (in such situations, "the results of this [comparative-disparity] analysis are of questionable probative value"); *Shinault*, 147 F.3d at 1273 (similar). Just so here, where for each of these pools, one marginal black prospective juror would have changed the numbers significantly. The same is true of the wheel sample drawn for the AO-12, which included just 106 African Americans. DN 122-2 at 2. Against that sample, the raw numbers of jurors selected for venires like Harris-Johnson's appear more consistent than inconsistent with the Court's approved jury-selection plan.

With these other pools in view, and mindful of the limitations of a comparative-disparity measurement, the Court sees no reason to conclude that the disparity in Harris-Johnson's petit pool betrays a systemic flaw as opposed to the luck of the draw (or lack thereof). *See United States v. Craft*, 165 F.3d 28, at *3 (6th Cir. 1998) (tbl.) ("requir[ing] evidence that a racially unbalanced jury pool was more than mere happenstance and in fact resulted from the very methods employed to select the jurors"); *United States v. Smallwood*, 188 F.3d 905, 915 (7th Cir. 1999) (rejecting challenge without "reason to think that the alleged under-representation resulting from anything other than coincidence").

The Court, to be clear, takes Harris-Johnson's concerns very seriously. Which is one reason why the Court called for testimony and records for Harris-Johnson, elbow counsel, and court staff to scrutinize. In a division containing few African Americans, however, even small fluctuations can yield statistically significant differences. And fluctuations are to some extent inevitable under a statutory scheme that envisions repeated random selection from a large pool of prospective jurors. On this record, Harris-Johnson hasn't identified any reason to believe that the data

reflect actual unlawful exclusion rather than variance or reliance on data sources (like voter registrations) that the statute requires. Her submissions supply no unlawful reason, in other words, for the disparity she cites: no cause related to the Court's jury-selection process, and no solution that might lead to a better or fairer process.[6]

### III. Harris-Johnson's Motions to Vacate the Verdict or Delay Sentencing

Even if her venire challenge fails, Harris-Johnson urges, the Court had no authority to "procee[d] with jury selection and trial" because "all proceedings shall be stayed" "[u]pon the filing of … a motion" to disqualify the venire. DN 164 at 1. Harris-Johnson purports to draw this language from § 1867(d), but she misquotes that provision.[7] In full, it reads:

> Upon motion filed under subsection (a), (b), or (c) of this section, containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.

Harris-Johnson's misquotation invites two interpretive errors.

First, she mischaracterizes the triggering condition. Under subsection (d), a motion requires immediate action from the Court only if it "contain[s] a sworn statement of facts which, if true, would constitute a substantial failure to comply

---

[6] Harris-Johnson separately moves to dismiss the indictment on grounds that the grand jury was selected by use of the same deficient scheme that produced her petit jury. *See* DN 123. Because she advances that argument against the petit and grand juries alike, the Court denies her grand-jury challenge for the same reasons.

[7] This is not the first time Harris-Johnson's briefing has misquoted the law. *See* DN 75 at 3 n.4 (describing a hallucinated quotation ostensibly from *Goldberg v. Kelly*, 397 U.S. 254 (1970)).

with" the Jury Selection and Service Act.  Harris-Johnson's oral midtrial motion did not.

Second, Harris-Johnson misunderstands the effect that follows the trigger.  When she *did* file affidavits—one during trial (DN 124 at 4) and another after (DN 148)—no mandatory stay kicked in.  Instead, the affidavits triggered a statutory "entitle[ment] to present [evidence] in support of [the] motion."  § 1867(d) (including "the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence").  And the Court immediately respected that entitlement by directing the Clerk to file responsive documents under seal and allowing Harris-Johnson to take testimony from the Deputy Clerk.  Initial Venire-Challenge Order at 3–4.

Only after Harris-Johnson filed a motion based on that evidence could the statute's stay language have done any work.  But even then, a stay is not automatic.  If it were, any criminal defendant could derail her trial by advancing a baseless jury challenge.  But it isn't; a stay depends upon the trial judge finding a violation of the law: "If," based upon the evidence, "the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the … jury."  § 1867(d).  The Court didn't make that determination during trial because Harris-Johnson's argumentation didn't support it.  Initial Venire-Challenge Order at 3 ("At this point, Harris-Johnson's observations about the makeup of the venire panel fall short of a demonstration that the procedures used amounted to a 'substantial failure to comply' with the law that would justify a stay of the trial").  On review, the Court reaches the same conclusion about Harris-Johnson's more robust posttrial motions.  Her filings give the Court no reason to find that the Clerk drew her jury inconsistent with the Act—much less that the Western District's Jury Plan marks a "substantial failure to comply" with statutory requirements.  § 1867(d).  So nothing supported a stay during trial.

Harris-Johnson is equally mistaken to insist that the Court delay sentencing thanks to alleged prosecutorial misconduct or violations of the civil-rights laws.  The Court has repeatedly rejected her objections to "prosecutorial authority," DN 100 at 2, and her suggestions that prosecutors have improperly withheld discoverable information, DN 75 at 4 n.5; *see* DN 87 (order denying motion to compel); DN 131 (order denying subpoena requests as irrelevant).  Harris-Johnson's renewed complaints about supposed disclosure obligations under FED. R. CRIM P. 12.4 and *Brady*, *see* DN 164 at 2–3, however, merely retread this well-worn ground.  Only one new set of objections warrants further discussion: that the prosecutors "misrepresented IRS testimony," "[w]ithheld exculpatory evidence showing 'without recourse' signatures," and "[i]gnored 1099-C debt cancellation filings."  *Id.* at 3.  To Harris-Johnson's mind, this amounts to a "[f]raud on the court" that "voids all orders

12

and judgments." *Id.* But nothing she describes amounts to misconduct, much less fraud. She doesn't say whose testimony she thinks prosecutors distorted, or how, or offer any reason to think this undescribed distortion affected the verdict. She doesn't explain why prosecutors should have given her extra copies of tax documents that *she* created and filed with the IRS. And she doesn't describe how a "without recourse" notation (an apparent hallmark of sovereign-citizen practice) could be exculpatory in the first place. The same goes for the 1099-C forms. Harris-Johnson's theory seems to be that by filling out these forms and mailing them to the IRS, she could "cancel" any financial "obligations" she owed to the Government. DN 171 at 1–3; *see* DNs 177 & 178 (scanned copies of 1099-Cs Harris-Johnson apparently sent to the IRS). Of course, that's not how it works.[8]

Many of Harris-Johnson's remaining arguments reduce to disagreement with the jury's verdict. But these motions are late. The right way to challenge a jury's verdict (say, by arguing that the evidence was insufficient) is through a motion under Criminal Rule 29. *See, e.g.*, *United States v. Mathis*, 738 F.3d 719, 735 (6th Cir. 2013). On a Rule 29 motion, the trial judge may acquit despite the jury's verdict if—"after viewing the evidence in the light most favorable to the prosecution"—no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). A defendant must file such a motion "within 14 days after a guilty verdict," however. FED. R. CRIM. P. 29(c)(1). And under Sixth Circuit precedent, "it is beyond the court's jurisdiction to grant an untimely motion for acquittal." *United States v. Rupert*, 48 F.3d 190, 192 (6th Cir. 1995), *aff'd sub nom. Carlisle v. United States*, 517 U.S. 416 (1996). That's the substance of Harris-Johnson's request, though, notwithstanding her reliance on Criminal Rules 47 and 57 (which don't authorize requests for such relief). *See* DN 162 at 1. And *Rupert* makes clear that the Court has no discretion to consider this untimely bid for acquittal.

Even if these post-trial motions might be construed as elaborations on earlier objections, Harris-Johnson's merits arguments misstate the law. Her central claim is that she can't be liable for making a false claim unless "the Government … take[s]

---

[8] Harris-Johnson argues that this supposed prosecutorial misconduct violated not only her constitutional rights but also rights secured under the 1866 and 1968 Civil Rights Acts. *See, e.g.*, DN 164 at 3. She never explains, however, how these statutes forbid the prosecutors' conduct. And in several respects, her briefing misstates the law. "Government actors" enforcing legitimate criminal laws *may,* contrary to her assertions, "[i]nterfere with contract rights" and "[i]nterfere with property rights." *Id.* And Harris-Johnson offers no theory for how anything that transpired in this long-running criminal case "den[ied]" her "equal benefit of all laws" or "[t]reat[ed] similarly situated individuals differently." *Id.* Meanwhile, this case's lengthy and prolific docket belies any notion that the "Defendant's filings were ignored," *id.*

13

action upon the claim." DN 161 at 6. To her mind, therefore, "unprocessed, unpaid, and unapproved tax returns cannot legally serve as completed § 287 offenses." *Id.* But that's not true. The Sixth Circuit has explained that § 287 (as opposed to some other statutes that criminalize false statements to the government) doesn't require that the false statement be "material"—that is, "capable of influencing" the recipient. *United States v. Logan,* 250 F.3d 350, 361 (6th Cir. 2001) (abrogated on other grounds); *see id.* at 358 ("the plain language neither mentions materiality nor in any way implies that the claim must be material"). *See also United States v. Lutz,* 154 F.3d 581, 588 (6th Cir. 1998) (holding that 18 U.S.C. § 1001 *does* require materiality). That holding, of course, rules out the more demanding evidence Harris-Johnson would require.

And of course, even if § 287 did require materiality, the Government put on plenty of evidence for a reasonable jury to find it. According to the Government's evidence, Harris-Johnson's tax filings not only could but *did* influence the IRS to pay—to the tune of more than $6 million.

Harris-Johnson's sole citation to binding authority confirms these conclusions. Criminal liability under § 287, the Sixth Circuit has held, may attach either to "attempt[s] to avoid refunding to the government … payments that [the defendant] ha[s] received but to which he [is] not entitled" or to requests for payment without entitlement. *United States v. McBride,* 362 F.3d 360, 370–71 (6th Cir. 2004). On the Government's evidence, Harris-Johnson did both. In that respect, she is unlike Mr. McBride, who "did not attempt to elicit a payment from the IRS." *Id.* at 370. *See also id.* at 371–72 ("Because McBride never received any advance payments from the government to which he was not entitled, nor could his action of sending the IRS a bad check have possibly elicited any payment from the government, he cannot, as a matter of law, be found liable under § 287.").

Harris-Johnson makes no more headway by objecting to the use of "uncharged years" for sentencing purposes. DN 167 at 2. Under the main decision she cites, "any fact … that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 476 (2000) (quotation marks omitted). *See also Erlinger v. United States,* 602 U.S. 821, 833 (2024) (*Apprendi*'s principle "also applies when a judge seeks to increase a defendant's *minimum* punishment"). Circuit precedent applying this rule, however, allows trial judges to "includ[e] unindicted conduct in the loss calculation," *United States v. Skouteris,* 51 F.4th 658, 672 (6th Cir. 2022), at least so long as it doesn't "increase the prescribed range of penalties to which [the defendant] is exposed," *Erlinger,* 602 U.S. at 835. Harris-Johnson needn't fear that result.

14

Nor does Harris-Johnson give the Court reason to delay sentencing thanks to supposed discovery obligations. To calculate loss and determine a sentence, she says she needs to look at "all ledger entries, CUSIP records, IRS transcripts, and trust-accounting documents." DN 167 at 1. What documents does she expect to find? The IRS's "double-entry bookkeeping … records," apparently, including "Accounts Receivable," "Accounts Payable," and a "General Ledger for all alleged tax liabilities"—along with "assessment records under 26 U.S.C. §§ 6201–6203," "CUSIP-Linked Financial Instruments," "Foreign situs trusts," and so on. *Id.* at 2–3.

All these and more, Harris-Johnson insists, are subject to her right to inspect under the Fifth Amendment's Due Process Clause, the Sixth Amendment's Confrontation Clause, FED. R. CRIM. P. 16(a)(1)(E), FED. R. EVID. 1002, and the application notes to U.S.S.G. § 2B1.1. *See id.* at 1. Most of these documents, however, either don't exist or bear no relation to Harris-Johnson's convictions. This is a point the Court, the prosecution, and witnesses for the Government explained repeatedly before and during trial. To the extent such records do exist, moreover, Harris-Johnson gives no reason to think they would've strengthened her defense—especially given the abundant documentation already produced by the Government and presented at trial. Of course, trial judges *may* provide for "an evidentiary hearing and/or additional document discovery" before sentencing if factual disputes warrant doing so. *United States v. Markin*, 263 F.3d 491, 498 (6th Cir. 2001). But neither the Fifth nor the Sixth Amendment stands for a constitutional entitlement to extra documents, over and beyond voluminous records introduced at trial, to verify loss ahead of sentencing. *See, e.g.*, *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case[.]").[9]

None of these arguments, in sum, gives the Court a reason to displace the verdict or delay Harris-Johnson's sentencing.

Sitting uncomfortably alongside this request for a delay, however, is Harris-Johnson's complaint that her sentencing is already too late. The Speedy Trial Act, she says, required the Court to try her case "within 70 days" of her indictment. DN 185 at 1. The argument raises an eyebrow, given Harris-Johnson's repeated requests for pretrial and posttrial continuances. But it's also legally mistaken. First, the speedy-trial clock started when Harris-Johnson was arraigned in December 2023— not when she was indicted months earlier. 18 U.S.C. § 3161(c)(1). Next, the Court excluded time under the Speedy Trial Act beginning on January 12, 2024. *See* DN 18 at 1 (citing § 3161(h)(7)(B)(iv)); *see, e.g.*, DNs 19, 20, 21, 23, 27, 34, 37, 39, 42, 52 (also excluding time between March 2024 and September 2025). Then, when Harris-Johnson began filing motions *pro se* and asked to fire her lawyer, *see* DN 25, those

---

[9] Criminal Rule 16, meanwhile, concerns discovery *before* trial. And Evidence Rule 1002 lies even further afield.

motions further paused the Speedy Trial clock. § 3161(h)(1)(D). And last, as Harris-Johnson requested trial delays, the Court accommodated those too. *See* DN 48 (setting trial for November 2025 and excluding time between July and November of that year); DN 71 (continuing trial at Harris-Johnson's request); DN 76 (excluding time until new January 2026 trial date accordingly). To be sure, this case has taken longer than most. But Harris-Johnson's many requests for extensions and her decision to proceed *pro se* are the reasons why. And she doesn't contest the Court's decisions, as the litigation unfolded, to accommodate her motions and requests by excluding time.

Last, Harris-Johnson asks that the Court delay sentencing until her appeal has concluded. DN 170 at 1 ("Defendant … respectfully moves this Court to stay all further proceedings, including sentencing … until her appeal is resolved") (emphasis deleted). This request is moot: the Court of Appeals has now dismissed Harris-Johnson's appeal for lack of jurisdiction. *See* DN 192 (Court of Appeals judgment); DN 193 (order acknowledging the judgment). To the extent Harris-Johnson seeks a stay of the *execution* of a sentence pending appeal, *see* DNs 166, 168 & 186 (citing 18 U.S.C. § 3143(b) and FED. R. CRIM. P. 46(c)), the Court will decide that question on the record at the sentencing hearing.

The same goes for Harris-Johnson's sentencing-related arguments. Her objections to the loss amount (DN 171), to enhancements (DN 174), and to the presentence report (DN 180) are appropriate for *resolution* at a hearing; they offer no reason to *delay* one. The Court will therefore follow its usual practice and address these arguments on the record in due course.

Harris-Johnson has also indicated her preference to proceed to sentencing and appeal without the benefit of the elbow counsel (previously defense counsel) who has ably and patiently assisted her self-representation. See DN 183 at 1 (asking that the Court "terminate" Scott Marcum). To her mind, the "election" to proceed *pro se* is inconsistent with elbow counsel's appearance at proceedings and "recei[pt]" of "communications." *Id.* Yet courts routinely appoint standby lawyers to help *pro se* defendants navigate dockets and courtrooms. And Harris-Johnson's assertion that Scott Marcum—a capable, experienced criminal defense lawyer—caused "[o]ngoing prejudice" by sitting next to her at trial, *id.*, enjoys no record support. On the contrary: Harris-Johnson willingly accepted Marcum's support, worked with him during trial, and benefitted from his expertise. Harris-Johnson is free, however, to proceed without him going forward.[10]

---

[10] Harris-Johnson complains that rather than give her sealed records directly, the Deputy Clerk sent those documents to Marcum. *See id.* at 2. This doesn't amount to prejudice, however. Harris-Johnson has had ample opportunity to raise her arguments. Any difficulty

### ORDER

Given the Court of Appeals' recent order, the Court denies as moot Harris-Johnson's requests to delay sentencing pending appeal (DNs 170 and 182). The Court denies Harris-Johnson's motions to dismiss the indictment, vacate the verdict, compel discovery, or further delay sentencing (DNs 123, 124, 149, 150, 161, 164, 167, 169, 185). The Court withholds decisions until the sentencing hearing on Harris-Johnson's sentencing-related arguments and requests for release pending appeal (DNs 166, 168, 171, 180, 186). The Court grants Harris-Johnson's request to proceed without elbow counsel (DN 183) and asks the Clerk to terminate Scott Marcum.

Sentencing remains set for **May 12, 2026, at 12:00 p.m. Central, in the Paducah courthouse**.

---

accessing the sealed records concerning her venire challenge, for instance, evidently didn't prevent her from filing seven separate briefs on the question. *See* DNs 123, 124, 149, 150, 161, 164 & 169.